# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GROUP AGAINST SMOG AND POLLUTION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 14-595 |
| SHENANGO INCORPORATED, | ) | Judge Cathy Bissoon |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

This matter is before the Court upon Defendant's Motion to Dismiss (Doc. 7). For the reasons that follow, Defendant's motion will be granted.

### A. Introduction

Defendant Shenango Incorporated ("Shenango") operates the Neville Island Coke Plant ("the Facility"), a coke manufacturing and byproducts recovery facility located in Allegheny County, Pennsylvania. See Amended Complaint (Doc. 4) ¶¶ 1, 5. Group Against Smog and Pollution ("GASP") is a Pennsylvania non-profit dedicated to promoting a healthy environment by improving the air quality in southwestern Pennsylvania and the surrounding regions. Id. ¶ 2. GASP's membership is composed of individuals who live in the vicinity of the Facility and are therefore exposed to the Facility's emissions. Id. ¶ 3.

### B. Regulatory Background

The Facility is subject to National Ambient Air Quality Standards ("NAAQS") established by the Environmental Protection Agency ("EPA") pursuant to the Clean Air Act,

42 U.S.C. § 7604. The NAAQS provide, *inter alia*, emissions standards regulating the concentrations of certain pollutants allowed to be discharged into the ambient air. See id. §§ 7408, 7409. In turn, each state must develop a "state implementation plan" ("SIP"), subject to EPA approval, detailing the state's strategy for achieving compliance with the NAAQS. Id. § 7410. Once approved by the EPA, the terms of the SIP become enforceable standards under federal law. Id. § 7413.

Pennsylvania's SIP designates the Allegheny County Health Department ("ACHD") as the agency responsible for enforcing air pollution laws in Allegheny County. See Amended Complaint (Doc. 4) ¶ 15. To that end, the ACHD's Rules and Regulations contain a series of emissions standards designed to protect "the health, safety and welfare of the citizens of Allegheny County." ACHD Rules and Regulations Art. XXI, § 2101.02.c.1. Three of these regulations are pertinent to the instant case. First, Section 2105.21.b.1 restricts visible emissions from any battery of coke ovens to no more than five percent (5%) of the door areas of the operating coke ovens (the "five percent door emissions standard"). Second, Section 2105.21.f.3 prohibits combustion stack emissions with opacity greater than 20 percent for three minutes over a 60 minute period (the "20 percent combustion stack opacity standard"). Finally, Section 2105.21.f.4 prohibits combustion stack emissions with opacity greater than 60 percent (the "60 percent combustion stack opacity standard").

### C. **Factual Background**

In 2012, the ACHD, EPA, and the Pennsylvania Department of Environmental Protection ("DEP") filed an action in the United District Court for the Western District of Pennsylvania against Shenango based on alleged violations of each of the three standards described above. On November 6, 2012, the parties filed a consent decree (the "2012 Consent Decree") purporting

2

to resolve the violations at issue in that action. Id. ¶ 30; Consent Decree (Doc. 8-1). The 2012 Consent Decree incorporated the limits on visible emissions set forth in Article XXI of the ACHD Rules and Regulations, required Shenango to implement various corrective measures to address the 20 and 60 percent combustion stack opacity standards, and specified a schedule of stipulated penalties in the event of further non-compliance. Consent Decree (Doc. 8-1) ¶¶ IV.A.1-3. The 2012 Consent Decree also assessed $1.75 million in civil penalties. Id. ¶ VII.A. Additional stipulated penalties of $148,500 and $28,350 were assessed on April 8, 2014, and July 3, 2014, respectively, based on violations of the 20 and 60 percent combustion stack opacity standards that occurred between 2012 and December 31, 2013. See Stipulated Penalty Demands (Doc. 8-3).

On February 6, 2014, GASP sent Shenango a notice of intent to sue, in which it cited violations of the five percent door emissions standard and the 20 and 60 percent combustion stack opacity standards that allegedly occurred between July 26, 2012, and September 30, 2013. Amended Complaint (Doc. 4) ¶ 32; Notice of Intent (Doc. 4-3). On April 7, 2014, the ACHD initiated an enforcement action against Shenango in the Allegheny County Court of Common Pleas based on the same violations of the five percent door emissions standard. See Amended Complaint (Doc. 4) ¶ 33. On that same date, the ACHD and Shenango presented the court with a proposed Consent Order and Agreement (the "2014 COA") intended to settle those claims. Id. ¶ 34. Pursuant to that agreement, the ACHD assessed a $300,000 civil penalty, required Shenango to undertake various corrective measures to reduce air pollution, and reaffirmed that the 2012 Consent Decree remained in effect with respect to violations of the 20 and 60 percent combustion stack opacity standards. See 2014 COA (Doc. 4-6) ¶¶ 20, IV, V.

Dissatisfied with the outcome of the ACHD's 2014 enforcement action, GASP initiated the instant lawsuit on May 8, 2014. (Doc. 1). In its amended complaint, GASP alleges that Shenango violated the 20 and 60 percent combustion stack opacity standards at least once on 369 separate days between July 26, 2012, and March 31, 2014. See Amended Complaint (Doc. 4) ¶ 40. GASP also alleges that Shenango violated the five percent door emissions standard on 39 separate days during that same time period. Id. ¶ 37. Finally, GASP asserts that Shenango has continued to violate each of these standards on an intermittent basis since March 31, 2014. Id. ¶ 41.

### D.  Analysis

Resolution of the instant motion turns on a narrow issue: whether the Court lacks subject matter jurisdiction over this action because the ACHD is already diligently prosecuting GASP's claims. Because this issue presents a factual challenge to this Court's jurisdiction, "the court is neither confined to the allegations in the complaint nor bound to presume their truth." Citizens for Clean Power v. Indian River Power, LLC, 636 F. Supp.2d 351, 356 (D. Del. 2009) (holding that a jurisdictional challenge based on "diligent prosecution" is a factual challenge pursuant to Federal Rule of Civil Procedure 12(b)(1)). Moreover, the Court may consider "affidavits, depositions, and testimony" in order to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997).

The Clean Air Act provides that "any person may commence a civil action on his own behalf" against violators of the Act's emission standards or limitations. 42 U.S.C. § 7604(a)(1). However, a citizen suit may not be commenced if the EPA or the state already "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance." Id. § 7604(b)(1)(B). The purpose underlying the diligent prosecution provision is

that "a defendant not be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standards." Conn. Fund for the Environment v. Contract Plating Co., Inc., 631 F. Supp. 1291, 1293 (D. Conn. 1986).

In determining whether a state enforcement action qualifies as diligent prosecution, there is a "heavy presumption" that the state's prosecution was diligent. Environmental Integrity Project v. Mirant Corp., 2007 WL 62619, at *1 (D. Md. Jan. 3, 2007); Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage District, 382 F.3d 743, 760 (7th Cir. 2004) ("We recognize that diligence on the part of the State is presumed."). Indeed, "the relevant test to determine if a state enforcement action qualifies as diligent prosecution is whether the prosecution is totally unsatisfactory." Citizens for Clean Power, 636 F. Supp.2d at 357 (citations to quoted sources omitted). This heavy presumption of diligence may only be overcome by "persuasive evidence that the state has engaged in a pattern of conduct that could be considered dilatory, collusive, or otherwise in bad faith." Connecticut Fund, 631 F. Supp. at 1293.

Where the prior enforcement action culminates in a settlement agreement, courts have recognized that "[t]he choice to settle with a violator [is] within a government agency's discretion, even if citizens might have preferred more stringent terms than those determined by the government to be appropriate." Citizens for Clean Power, 636 F. Supp.2d at 357 (citations to quoted sources omitted). As several courts have noted:

> [T]he mere fact that the settlement reached in the state action was less comprehensive than the remedy sought in the instant action is not sufficient in itself to overcome the presumption that the state action was diligently prosecuted. Indeed, if the question of "diligent prosecution" were always to depend upon the outcome of the prior pending state suit, a state suit in which the defendant prevailed or reached some compromise with the state could never preclude a subsequent citizens' suit in federal courts no matter how diligently the state suit had been prosecuted.

5

Clean Air Council v. Sunoco, Inc., 2003 WL 1785879, at *3 (D. Del. Apr. 2, 2003) (citation omitted).

In the instant case, the amended complaint alleges violations of the five percent door emissions standard set forth in Section 2105.21.b.1, and the 20 and 60 percent combustion stack opacity standards set forth in Sections 2105.21.f.3 and 2105.21.f.4. Because each of these standards formed the basis for a prior ACHD enforcement action, the Court's task is to determine whether those actions are being "diligently prosecuted."

The five percent door emissions violations were primarily addressed by the ACHD through the 2014 state court action that culminated in the 2014 COA. See 2014 COA (Doc. 4-6) ¶¶ 8.b, 9, 10.b, 11, 12.b, 14.b, 15.b, 16.a (alleging excess visible emissions from door areas in violation of Section 2105.21.b.1). In reaching that settlement agreement, the ACHD acknowledged that Shenango already had taken significant steps to reduce emissions, including improved equipment design, revised inspection procedures, and prompt replacement of faulty doors. Id. ¶¶ 18.c, 18.9. To correct the ongoing violations, the 2014 COA assessed $300,000 in civil penalties, directed Shenango to spend an additional $300,000 to conduct an engineering study (and implement improvements recommended by that study) to reduce violations, and explicitly retained the right to assess additional penalties and corrective measures if necessary. Id. ¶¶ V.A, VI.A, II.I-J. To monitor compliance, third-party inspectors performed 181 inspections of the coke oven doors between January 1, 2014 and June 30, 2014 pursuant to an EPA contract managed by the ACHD. See DeLuca Affidavit (Doc. 8-4) ¶¶ 4-6. ACHD inspectors performed an additional 92 inspections during that time period. Id.

Shenango's violations of the 20 and 60 percent combustion stack opacity standards were addressed by the 2012 COA. Pursuant to that agreement, Shenango paid an initial civil penalty

6

of $1,750,000 and subsequent penalties of $148,500 and $28,350. Shenango also implemented a variety of protocols designed to improve compliance including long-term repairs, monitoring, and additional stipulated penalties. Because the 2012 COA is open-ended, the ACHD continues to monitor emissions and assess stipulated fines for non-compliance. Indeed, the agreement cannot be terminated until Shenango demonstrates that it has fully complied with the 20 and 60 percent opacity standards for combustion stacks. See 2012 COA (Doc. 8-1) ¶ XXI.B.1.a.

On balance, the 2012 and 2014 COAs demonstrate that the ACHD is in the process of diligently prosecuting and enforcing the same violations alleged in the instant lawsuit. As noted in several cases, indicia of diligence include "whether the government required (or at least sought) compliance with the specific standard, limitation, or order invoked by the citizen suit; whether the government was monitoring the polluter's activities or otherwise enforcing the permits at issue after settlement with the polluter and up to the time of the citizen suit; the possibility that the citizen-alleged violations will continue notwithstanding the polluter's settlement with the government; and the severity of any penalties compared to . . . the polluter's economic benefits in not complying with the law." Citizens Legal Envtl. Action Network, Inc. v. Premium Standard Farms, Inc., 2000 WL 220464, at *13 (W.D. Mo. Feb. 23, 2000) (collecting cases) (citations omitted). Here, the ACHD explicitly sought compliance with the same standards at issue in the instant suit in the previous enforcement actions. In furtherance of those standards, the ACHD imposed significant civil penalties and directed Shenango to implement various corrective measures and structural improvements. Moreover, the ACHD continues to monitor Shenango pursuant to those open-ended agreements (and, if necessary, impose additional sanctions). Although GASP may have preferred "more stringent terms" than those negotiated by the ACHD, the choice to settle with a violator (and the terms of that settlement)

7

is ultimately within the discretion afforded to the government agency. See, e.g., Citizens for Clean Power, 636 F. Supp.2d at 357.

A review of the pertinent case law supports this conclusion. For example, in Citizens for Clean Power, the court addressed emissions violations stemming from a regulation promulgated by the Delaware Department of Natural Resources and Environmental Control ("DNREC") to reduce the amount of certain pollutants in emissions from electric generating plants. Citizens for Clean Power, 636 F. Supp.2d at 354. The defendant, a power plant, had previously entered into a stipulated consent order with the DNREC that provided for a graduated, long-term plan to bring the defendant's emissions into compliance. Id. A citizen's group challenged that settlement agreement, asserting that it was not the product of a diligent prosecution because it had failed to actually curtail emissions violations. Id. The group supported its contention by noting that the defendant had violated the opacity limitations in the pertinent regulation 6,304 times in a prior four-year period. Id. at 355.

On review, the district court held that the consent order represented a diligent prosecution of the pertinent regulation, despite that the defendant had not yet achieved total compliance. Id. at 357. The court emphasized that the DNREC's "wide discretion . . . to settle with alleged violators" extended to the DNREC's decision to enter into a settlement agreement that permitted the defendant to achieve compliance over a period of years, rather than immediately. Id. at 357 n. 10. Other courts have reached the same conclusion. See, e.g., Clean Air Council, 2003 WL 1785879, at *5-6 (holding that a settlement agreement containing an open-ended compliance period, provisions for monitoring, and a stipulated schedule of penalties was the product of a diligent prosecution despite ongoing violations); Environmental Integrity Project, 2007 WL 62619, at *1-2 (holding that a settlement agreement was diligently prosecuted despite not

8

requiring full compliance immediately); North & South Rivers Ass'n v. Scituate, 949 F.2d 552, 558 (1st Cir. 1991) (deeming state action to enforce an order "diligent" and noting that "[m]erely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief.").

GASP challenges this conclusion on two grounds. First, it contends that neither of the agreements actually requires Shenango to implement measures that will eventually result in full compliance with the CAA, rather than simply a reduction in violations. To this end, GASP relies heavily on Friends of Milwaukee's Rivers, 382 F.3d 743, an action based on the Clean Water Act.[1] Under the facts of that case, the state of Wisconsin and a municipal wastewater treatment agency ("the MMSD") entered into a settlement agreement in 1977 that required the MMSD to construct a sewage treatment overflow tunnel known as the "Deep Tunnel" to prevent sewage overflow from discharging into Lake Michigan and Milwaukee's rivers. Id. at 749. Despite the completion of the Deep Tunnel project in 1994, Milwaukee's sewers continued to occasionally discharge waste into rivers and lakes. Id. at 750. The plaintiff, an environmental activist group, grew concerned about the continuing discharges and filed an enforcement action pursuant to the Clean Water Act. Id. In response, the MMSD and the state entered into a second settlement agreement requiring the MMSD to construct three additional tunnels. Id. at 750-51. The plaintiff challenged the settlement by arguing, *inter alia*, that this remedy would not result in the complete elimination of the illegal overflows, as the Act required. Id.

The Court of Appeals for the Seventh Circuit sided with the plaintiff, noting that, although increasing the storage and conveyance capacity in MMSD's system would reduce the

---

[1] Like the Clean Air Act, the Clean Water Act contains a provision authorizing citizen suits, 33 U.S.C. § 1365(b)(1)(B), and a provision barring those suits when a government enforcement action to enforce the same limitation has been commenced and is being diligently prosecuted. See id. at § 1319(g)(6)(A)(ii).

9

number and volume of overflows, it would not be enough to completely eliminate them. Id. at 763. The court based this conclusion on the failure of the first Deep Tunnel to effectuate compliance, MMSD's own admission that the construction of further tunnels would be unlikely to eliminate overflows, and the extremely dilatory pace at which MMSD determined that the original Deep Tunnel had been under-designed. Id. at 764.

Unlike in Friends of Milwaukee's Rivers, the consent decrees in the instant case go well beyond merely requiring a single capital improvement designed to reduce, but not eliminate, the pollution at issue. In addition to providing penalties for both past and future violations, the 2012 and 2014 COAs require Shenango to continuously implement protocols and make capital improvements over of the full life of those consent decrees, each of which is still in force. As noted by the ACHD, these requirements are "long-term, ongoing measures" specifically designed to bring Shenango into full compliance. DeLuca Affidavit (Doc. 8-4) ¶ 9. Courts frequently have endorsed this type of ongoing, compromise-driven measure for curing violations. See Citizens for Clean Power, 636 F. Supp. 2d at 357-58 (concluding that an enforcement action was diligent despite only providing an "interim solution to defendant's alleged opacity violations" in the short term because the long-term effect of the enforcement action was designed to achieve complete compliance); Environmental Integrity Project, 2007 WL 62619, at *1-2 (distinguishing Friends of Milwaukee's Rivers and concluding that an enforcement action is not "totally unsatisfactory" simply because it does not mandate immediate compliance with applicable regulatory standards); Scituate, 949 F.2d at 556 (finding that an administrative order that did not expressly require compliance with a water quality standard was a diligent prosecution).

GASP next contends that the ACHD's 2014 enforcement action was deficient because the parties failed to provide an opportunity for the public to intervene or comment on the terms of the 2014 COA. This argument was squarely rejected in Clean Air Council:

> The Council first argues that the Final Judgment's swift execution effectively excluded its members from participating in the settlement negotiations. However, in making this argument, it has failed to point to any statutory or regulatory language giving citizens such a right to participate in enforcement actions. The court concludes that this failure is due to the fact that there is no such right. Indeed, the Clean Air Act only provides society in general with a remedy against air pollution. See 42 U.S.C. § 7401(b). Thus, once the State acts to achieve that result, the Act does not authorize citizens to duplicate those efforts.
>
> Moreover, the Council has pointed to no case invalidating a prosecution under the Clean Air Act because citizens were excluded. Instead, the cases upon which the Council relies involve the Federal Water Pollution Control Act, commonly known as the Clean Water Act. This act, however, expressly provides for public participation at various points in enforcement proceedings. See 33 U.S.C. § 1319(g)(4); Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc., 890 F. Supp. 470, 490 (D.S.C.1995) (relying on the public participation provision of the Clean Water Act); Love v. New York State Dep't of Envtl. Conservation, 529 F. Supp. 832, 843–844 (S.D.N.Y.1981) (same). Thus, Congress has demonstrated that it is eminently capable of explicitly providing for public hearings when it deems them necessary. It did not do so when enacting the Clean Air Act.

Clean Air Council, 2003 WL 1785879, at *4. Significantly, GASP relies entirely on the precise same authorities that were adeptly distinguished in Clean Air Council. See GASP's Brief in Opposition (Doc. 9) at 13 n. 59. In the absence of any contrary authority, the Court agrees with the sound analysis quoted above and reaches the same conclusion.

### E. Conclusion

On balance, the Court finds, for the reasons set forth above, that the Clean Air Act violations alleged in the amended complaint are already being diligently prosecuted by the

ACHD.  Thus, and for all of the other reasons stated above, the Court hereby enters the following:

## II.  ORDER

Defendant's Motion to Dismiss (**Doc. 7**) is **GRANTED**, and this case is dismissed for want of jurisdiction.

IT IS SO ORDERED.


March 26, 2015                                        s/ Cathy Bissoon
                                                                                   Cathy Bissoon
                                                                                   United States District Judge


cc (via ECF email notification):

All counsel of record